*Alexander Dowling*, for the appellees.

---

## Nave's Adm'r *v.* Williams.

Evidence—Witness—Color.—It is the duty of the Court to determine the competency of witnesses, and where the objection to the competency of the witness rests upon the allegation that he has such an amount of negro blood as disqualifies him to testify, the Court may, upon inspection, determine *prima facie* his competency, but if his blood be not sufficiently apparent for such mode of determination, then the Court may examine other witnesses, either to prove the blood of the witness from reputation amongst those who knew him, or to establish the character of his blood by the testimony of experts.

APPEAL from the *Fountain* Circuit Court.

Nave's Adm'r *v.* Williams.

HANNA, J.—This was a suit against the appellees for breaking and entering the close of one *Nave,* now deceased, and carrying away certain property, to-wit: cow, &c. Answers in denial.

There are three points made:

1. On the ruling suppressing parts of depositions.
2. For refusing to suppress other depositions.
3. In refusing instruction asked by plaintiff.

The trial resulted in a judgment for the defendants.

It appears that the depositions of two persons named *Williams* had been taken by the defendants and were on file. The plaintiff took the depositions of two witnesses named *Kernodle.* The questions propounded to these latter were intended to ascertain whether said persons, by the name of *Williams,* were of mixed blood. One of the witnesses testified that such was the "report" in the neighborhood. The other that he had "heard him called negro *John* and had heard one man say his father was half negro, and from his looks and what I am informed he is about one-fourth negro." It is shown that this evidence was directed to *Williams,* the elder, and the other was his son. Was it admissible?

We have not been referred to any authority upon the point involved, and in the limited time and number of books at our command have not been able to find the question as fully treated as we could have desired.

This does not fall strictly within the principle upon which pedigree is sometimes established. A man of mixed blood, or having that appearance, might be offered as a witness, whose pedigree was not known at all by any persons within the jurisdiction of the Court, so that evidence of his descent could not be produced. Under our practice the Court determines the question of competency. We suppose, perhaps, in a case where the blood of the witness is manifest, the Court, upon inspection, might determine *prima facie* that he was

not competent. If the correctness of the determination were doubtful, evidence might be heard. But of what char-acter?

In *Gentry* v. *Polly McMinnis*, 3 Dana (Ky.) 390, it was held, in an action by her to test the question of her freedom or slavery, "that inspection by the jury was proper, and that if, after such inspection, they should, upon a consideration of all the facts before them," &c. Here the question was not left to mere inspection alone, but was taken together with other matters for consideration. Those other matters were evidence as to whether she was born in *Pennsylvania* after the act of 1780, and of the length of time she had been in service. In *Chancellor* v. *Milly*, 9 Dana 24, *Milly*, upon an issue whether she was entitled to her freedom or not, was exhibited to the jury for their inspection, and was apparently a white woman about forty years old. To rebut the presump-tion arising from such inspection, *Chancellor* offered to prove "that in the family in which she was born and reared from infancy she had ever been called and reputed the child of a woman of color." The evidence was refused. The Court of Appeals reversed the decision, and say: "After the lapse of forty years such a fact would scarcely ever be susceptible of any other proof than that of reputation. And we perceive no reason why it should not be admissible in a suit for free-dom as well as in all other suits where proof of pedigree be-comes material. * * Such reputation would have been admissible in *Milly's* favor, if her reputed mother had been free," &c. In the case of *Hudgins* v. *Wights*, 1 H. & M. (Vir.) 139, which was a similar suit to those above referred to, it had been proved, "that the people in the neighborhood said that if she would try for her freedom she would get it." The Court remarks that, "this general reputation and opinion of the neighborhood is certainly entitled to some credit; it goes to repel the idea that the given female ancestor of *Hannah*

was a lawful slave," &c. See, also, to the same effect, *Bryan* v. *Walton,* 20 Geo. 480. In the same case it is said that, "it may sometimes be necessary for a judge to decide upon his own view." An instance is given where three persons are brought before a judge, the one black, with a flat nose and woolly head; the next copper colored, with long, jet black, straight hair; the other fair complexion, brown hair, not inclined to wool, with a prominent Roman nose. There is no evidence but that of the eyes of the judge; that is, he sees them, inspects them, derives information through his own sense of sight, and not of hearing, as if another should examine them and testify. What should he do? Surely he could do nothing but declare the first a negro, the second an Indian, and the third a white man, and let them take their positions accordingly, under the laws of the country. But if the blood of the different races had been, for generations, so mixed as to remove, to a great extent, the distinguishing mark of color, and to a lesser extent that of the flat nose and the wool, instead of hair; which mark remains, perhaps, the longest, and is the last to be eradicated; what should the judge do then? Examine the person offered as a witness, hear direct proof, if it can be had, of his birth and of his ancestors. If, because of the lapse of time, or from other sufficient reason, such proof can not be produced, then, we suppose, reputation may be resorted to. And, although we have seen no case to that effect, why could not the lights of science be brought to bear upon the doubtful question by the evidence of adepts, men of skill in this, as in any other physiological fact? It is true, such evidence, in either instance, should have more or less weight as it should directly or remotely bear upon the fact to be established to the satisfaction of the judge.

With this view of the question, the ruling of the Court would appear to be erroneous in suppressing parts of the

Nave's Adm'r *v.* Williams.

depositions that were suppressed. Perhaps a part of the last answer should have been stricken out. As to the effect of the ruling it is difficult to determine. If that was all the evidence that the party intended to present to the Court upon the question of the competency of the two *Williamses,* as witnesses, we are not prepared to say that it should have controlled the Court in excluding their evidence, and as there was no offer to introduce other or additional evidence upon that point, we can not presume he was prepared to offer such.

As the ruling of the Court in refusing to suppress depositions was upon a motion based upon the assumption that the witnesses, to-wit: these *Williamses,* were of mixed blood, and the plaintiff a white man, of course it follows that the Court did not, after the first ruling, do wrong in the second, for there was, then, no evidence before the Court of their incompetency because of such mixture.

The legal proposition sought to be impressed upon the jury by the instruction refused, was that a tenant holding farming lands, under his landlord, could not, without the consent of such landlord, sell his interest in the crop to a third person, and substitute such third person in the place of said tenant to gather said crop, &c. We think the Court ruled correctly in refusing this instruction. There was not, so far as shown, any prohibition against underletting, &c.

*Per Curiam.*—The judgment is affirmed, with costs.

*John M. Larue,* for the appellant.